of the acceptance was there consummated, and the money paid. In the Savings Bank Case, the notes were taken to Rhode Island, and there they were negotiated and the money paid. In the present case there was no loan made in Connecticut. The parties there agreed upon the terms of a loan to be made in New York, and it was made in New York.

It was urged on behalf of the trust company that the trustee of Dodge & Co. was estopped to dispute its claim on several grounds: First, because Dodge & Co. had charged White & Co. in account with these notes on their books; secondly, because, by a long course of dealing in similar paper, Dodge & Co. had led the public to believe that the paper made by Dodge & Co. and endorsed by White & Co., and put on the market, was the business paper of Dodge & Co.; and thirdly, because the trustee of Dodge & Co. had made proof of these notes as debts against the estate of White & Co. in bankruptcy. As to the first point, entries in the books of the bankrupts would not estop them, much less their assignee or trustee. Besides, as matter of bookkeeping, the charge of these notes was not improper, though they were accommodation notes. Book entries are made not with a view to the happening of insolvency, but with the expectation that obligations entered into will be performed. Although the mere giving of accommodation paper creates no debt unless and until the paper is negotiated, and therefore when bankruptcy intervenes and nothing has been done with the paper by the payee, the charge made becomes, in the event that has happened, erroneous in so far as it imports a debt from the payee to the maker; yet when the charge was made, it was doubtless expected that the notes would be negotiated by the payee and be paid by the maker with funds, to be afterwards received from and credited to the payee, and, in anticipation of this course of business, the charge was proper enough.

As to the second ground of estoppel it is enough to say that there is no evidence whatever that the trust company acted or relied on any act or representation whatever of Dodge & Co., except what appears on the notes themselves, and the making of notes payable to another party has never been held to be such a representation as estops the maker from showing that they were accommodation paper even in favor of one to whom the payee represented them to be such and who took them in good faith, on such representations of the payee. As to the third ground of estoppel, whether or not the trustee of Dodge & Co. had knowledge of the usury when he made proof of the notes against the estate of White & Co., does not appear. If he had not, he might very properly make proof of the notes as a contingent claim, assuming that they were outstanding and valid debts against Dodge & Co., in the hands of endorsees for value, in which case he would have a valid claim against White & Co., if they should be proved against Dodge & Co., and even if he had knowledge of the usury, the proof of them against White & Co., if improper, would not operate as an estoppel in favor of the trust company, since it was at most a mistake, liable to be corrected on motion of any other creditor of White & Co., and the trust company has not upon the faith thereof parted with its money or changed its position as to the notes in question, which is essential to the creation of an estoppel in pais.

Decision of register expunging the claim confirmed.

## Case No. 3,949.

### In re DODGE.

[4 Dill. 532.] [1]

Circuit Court, D. Iowa. 1877.

BANKRUPT ACT—REV. ST. § 5101—STATE AS PREFERRED CREDITOR.

Under the bankrupt act [of 1867 (14 Stat. 517)].—Rev. St. § 5101,—the state is entitled to be preferred to private creditors of the bankrupt.

Appeal from the district court of the United States for the district of Iowa.

The bankrupt was indebted to the state of Iowa, on account of contract, for the labor of convicts confined in the penitentiary at Fort Madison, the debt being secured by bond with sureties. The question arose, whether or not, under section 5101, Rev. St. U. S., the state has a right to have its claim declared prior to those of other creditors, and to have the same paid in full out of proceeds of bankrupt's estate in hands of asignee? The assignee objected to the allowance of same as a preferred claim, urging that congress had not intended by said section 5101 to give a state any greater preference under the bankrupt law than the statutes of such state gave to it, and that there is no statute in the state of Iowa giving the state such a preference; therefore, congress could not do so. The assignee also urged that a law which provides that one creditor, whether a state or individual, having no lien prior to bankruptcy, by virtue of contract, or statute, or custom, or otherwise, shall be paid, to the exclusion or prejudice of other creditors, violates the fundamental principles upon which a bankrupt law is based, and that it is simply a legislative confiscation of the debtor's estate for the benefit of a privileged class, and, when passed by congress, is unconstitutional and void. The district court ordered that the claim be allowed in full, as a preferred debt, and that the assignee pay the same out of funds in his hands belonging to said estate, after paying prior claims, if any. The order was brought to the circuit court for review.

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

Craig & Collier, for the State.

McCrary & Hageman, for assignee.

MILLER, Circuit Justice, after hearing the argument of counsel, affirmed the judgment of the district court. Affirmed.

## Case No. 3,950.

### DODGE et al. v. ARTHUR.

[22 Int. Rev. Rec. 402.]

Circuit Court, S. D. New York. Nov. 16, 1876.

ADOPTION OF REVISED STATUTES — CONSTRUCTION —CUSTOMS DUTIES — CLASSIFICATION — TIN AND TERNE PLATES.

[1. The fact that it was the intention of congress. in enacting the Revised Statutes, to compile existing laws without altering them, does not require the courts to give to a particular section a construction in opposition to the positive provisions thereof. in order to conform to the pre-existing statute; but, if the two cannot be reconciled. it is then to be presumed that congress supposed, and had reason to suppose, that the prior statutes had been changed, and intended to adopt such change.]

[2. Part of the tariff act of June 6, 1872, having been embraced in the Revised Statutes, that act was consequently repealed on June 22, 1874, by the express provisions of Rev. St. § 5596.]

[3. Tin plates and terne tin imported subsequently to the enactment of the Revised Statutes (June 22, 1874) were subject to the combined operation of sections 2503 and 2504: thus being dutiable at 90 per cent. of the 15 per cent. ad valorem imposed by the latter section.]

[4. Articles specifically provided for in a tariff act cannot be subjected to duty at a different rate under a general designation which would otherwise include them.]

This was an action by Wm. E. Dodge and others against Chester A. Arthur, collector of customs for the port of New York, to recover certain duties paid under protest.

Wm. M. Evarts and John E. Parsons, for plaintiffs.

H. E. Tremaine, Ass't U. S. Dist. Atty., for defendant.

SHIPMAN, District Judge (charging jury). The plaintiffs imported into the port of New York subsequently to June 22. 1874, sundry invoices of tin plates and terne tin. upon which the collector exacted a duty of 15 per cent. ad valorem. This duty was paid by the plaintiffs under protest. Appeals were subsequently duly made to the secretary of the treasury. who affirmed the decision of the collector. and this suit was subsequently commenced by the plaintiffs to obtain the amount of duty which they claimed had been improperly exacted. Tin plates are a well-known article of commerce, and are plates of sheet iron, which, having been properly prepared, have been plunged into a bath of molten tin, and carefully covered or coated with the latter metal. Terne tin is tin plate. used for roofing purposes. In this species of plate the brightness of color has been dulled by a slight admixture of lead in the molten tin bath. The terms "tin plate" and "terne tin," are well-known commercial terms, "terne tin" being a subdivision of the more general term "tin plate." "Tin in plates" is a general term which has been used for many years in the tariff acts, and is, by the uncontradicted testimony of the witnesses upon both sides, synonymous with the term "tin plates," and has been recognized as synonymous by the uniform construction which has been given to the term by the treasury department. which has uniformly exacted upon "tin plates" the duty imposed by the statutes upon "tin in plates."

Prior to the act of June 6, 1872 [17 Stat. 230], the duty which was by law imposed upon tin plates and terne tin was 25 per cent. The second section of that act provides that on and after the 1st day of August, 1872, in lieu of the duties imposed by law on the articles in this section enumerated, there "shall be levied, collected. and paid, on the goods, wares, and merchandise, in this section enumerated and provided for, 90 per centum of the several duties and rates of duty now imposed by law upon said articles severally," it being the intent of this section to reduce existing duties on said articles 10 per centum of such duties, i. e. "on all metals not herein otherwise provided for, and all manufactures of metal of which either of them is the component part of chief value, excepting percussion caps. watches, jewelry, and other articles of ornament." The fourth section of the same act provides that on and after August 1st, 1872, in lieu of the duties theretofore imposed by law on the articles mentioned in said section, there should be levied, collected and paid on the articles in said section enumerated, imported from foreign countries, the following duties and rates of duty, that is to say, "on tin in plates, terne tin or taggers tin, 15 per centum ad valorem." The duty upon tin plates was thus reduced 40 per cent., and it is not claimed that tin plates were included in the provision of the second section. By the Revised Statutes. which went into effect June 22, 1874, it was provided in section 2503 as follows, viz.: "There shall be levied. collected and paid upon all articles mentioned in the schedules mentioned in the next section, imported from foreign countries. the rates of duty which are by the schedules respectively prescribed; provided, that on the goods, wares and merchandise in this section enumerated and provided for. imported from foreign countries, there shall be levied, collected and paid only 90 per centum of the several duties and rates of duty imposed by the said schedules severally, that is to say. on all metals not herein otherwise provided for, and on all manufactures of metals of which either of them is the component part of chief value." etc. Among the articles enumerated in Schedule E. being the schedule of section 2504 pertaining to metals. were the following: "Tin in plates or sheets, terne and taggers tin, 15 per centum ad va-