SOUTHWESTERN. The (LESASSIER v.). See Case No. 8,274.

## Case No. 13,192.

### In re SOUTHWESTERN CAR CO.

[9 Biss. 76;[1] 19 N. B. R. 404.]

District Court, D. Indiana. July, 1879.

CONVICTS—HIRING OUT — CONTRACT —DEDUCTIONS —BANKRUPTCY—PREFERENCE.

1. Under the laws in Indiana, convicts may be hired in any number not exceeding one hundred in any one contract. The bankrupt en-

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

tered into four separate contracts with the state for the employment of one hundred convicts under each contract. The contracts were all executed at the same time but were signed by different sureties: *Held*, that the execution of these contracts was not a violation of the letter or spirit of the statute, and that the contracts were valid and binding.

2. By the terms of the contracts the state was to keep the convicts under good discipline and to keep them at diligent and faithful labor for the bankrupt. This was not done: *Held*, that the loss and damage sustained by reason of the failure of the state to perform these stipulations should be deducted from the contract price in estimating the amount due to the state upon the contracts.

3. A claim of the state upon a contract for the employment of convicts is entitled to preference under section 5101, Rev. St. U. S.

In equity.

James B. Meriwether, for claimant.
Alex. Dowling, for assignee.

By NOBLE C. BUTLER, Register: The state of Indiana, by Andrew J. Howard, warden of the state prison (south), filed its claim and proof of debt against the estate of the bankrupt in the sum of twenty-eight thousand, seven hundred and forty-four dollars and thirty-two cents. and asks that it be allowed and paid as a preferred debt under the terms of the third clause of section 5101, of the Revised Statutes of the United States. Objections to the allowance and payment of this claim and proof of debt, or any part of it, were filed by the assignee and, upon his application. a re-examination thereof, under rule 34 of the supreme court of the United States. was ordered and had. The evidence submitted upon this re-examination is herewith returned into court.

The claim is founded upon contracts between the claimant and the bankrupt for the labor of convicts in the state prison (south) and there are three questions presented for consideration by the evidence, viz.: (1) Were the contracts authorized by the laws of Indiana? (2) Have the stipulations of the contracts been fully performed by the claimant, and, if they have not been fully performed, is the assignee in bankruptcy entitled to a recoupment in any sum on account of such partial performance? (3) Is the claim or any part of it entitled to priority of payment?

These questions are now considered in the order in which they are mentioned.

First. As to the legality of the contracts. The acts of the general assembly of Indiana for the year 1857 provide (page 106): "Sec. 10. The convicts may be levied (or hired) in any number not exceeding one hundred in any one contract, in such manner as the directors. in their judgment, may consider to be most conducive to the interests of the state. All contracts for working convicts shall be given to the highest and best responsible bidder. The directors shall cause such notice to be given by publication of the time and place of letting to hire said convicts as they may deem most beneficial to the state. All contractors shall be required to give security to the state for the faithful performance of their contracts in such amount as the directors, in their judgment, may think proper. In allotting convicts whose labor is thus contracted for, the warden shall do it in such manner as he shall consider will give the convict such knowledge of any mechanical art as will be most conducive to his (their) interests after his (their) discharge." The word "one" is omitted from the phrase "any one contract," in Davis's Revision of the Statutes, and the counsel for the assignee seems to have been misled by the omission. There were four separate contracts in this case, which were executed simultaneously, and, although the principal parties thereto are the same, they are not exact counterparts of each other, for they are not subscribed by the same sureties. None of them is for the labor of more than one hundred convicts. In my opinion the execution of these contracts was not a violation or an evasion of either the letter or spirit of the statute. They do not contravene its express terms unless they are to be regarded as together forming a single contract for the labor of four hundred convicts. If this were true the sureties upon one of these contracts would be liable upon all of them, and this is clearly an untenable proposition. The statute does not prohibit more than one contract between the same parties, but the construction given it by the counsel for the assignee would operate as such a prohibition. There is no good reason why the state's contract with one party should be a bar to a subsequent contract with him, and, if separate contracts can be made with the same party a year, a day, or an hour apart, there is no good reason why they should not be made at the same time. To thus limit the authority of the prison officials would be, moreover. very injurious to the interests of the state. By placing restrictions of this sort upon its functionaries. it would not only exclude the larger industrial interests from competition for its convict labor, but, by lessening the number of competitors, it would diminish its value. On the other hand, it was equally for its benefit that the smaller industrial interests should not be excluded from competition for its convict labor, and, therefore, it enacted this statute which limits a single contract to the labor of not more than one hundred men. Without it, the larger and wealthier interests could have controlled the market, as they do almost everywhere; with it, the smaller interests are admitted to a more fair and even-handed competition with them, and the interests of the state are thereby promoted. The legislature was plainly governed, in the enactment of this statute, more by considerations of state policy than by the motives of philanthropy which are ascribed to them by the counsel for the assignee. In the law itself it is ex-

plicitly declared that the contract shall be made with reference to what "is most conducive to the interests of the state," and what "is most beneficial to the state." This is to be the primary object in making the contract, and the state exhibits its regard for the interests of the convicts, secondarily, by directing that, after the contracts are made, the convicts shall be allotted by the warden "in such manner as he shall consider will give the convict such knowledge of any mechanical art as will be conducive to his interest after his discharge." For the foregoing reasons I find the contracts upon which this claim is founded were made according to the laws of Indiana.

Second. As to the full or partial performance of the contracts. The convicts were inexperienced; they had no previous knowledge of the work they were required to do. They were not let to the bankrupt as practical car-builders or chain-makers, or at the price such men can obtain for their work. The contract was for an inferior sort of labor, at a low rate of wages, and the bankrupt relied upon its ability to furnish the convicts with such instruction as would enable them to earn the price to be paid for their labor.

The value of this labor was further depreciated by another consideration. The laborers were lawless and unruly men who had been imprisoned by the state because the ordinary restraints of society had been insufficient to subdue their turbulent and vicious propensities. They could not be instructed in their work, and their work could not be had, without the continuous and vigilant presence and frequent application of physical force.

These were the necessary conditions of the labor that was furnished by the state and they operated to lessen its worth under the most favorable circumstances. Without the aid of the state, to make the convicts docile and tractable, their labor would have been entirely worthless, or, more properly, it could not have been obtained, for it was purely compulsory. Therefore these were important stipulations of the contract, viz.: "7th. The said party of the first part further agrees to keep said convicts under good discipline at the expense of the state. * * *" and, "8th. Said convicts shall be kept at diligent and faithful labor for said party of the second part an average of ten hours a day through each year, Sundays excepted. * * *" This was the undertaking of the claimant and its performance would have been, no doubt, less difficult if the convicts had always been properly instructed and kept steadily at their work, as is urged by the counsel for the claimant and as is shown by some of the testimony. But their instruction and the supply of work by the bankrupt were not duties that it owed under the contract. They were duties to itself merely, by the neglect of which it suffered pecuniary loss as the only penalty. The contract itself provides, "If

all or any of said convicts are idle on account of any default of said party of the second part they shall be paid for as though they were employed," and that is the end of it. But the duty of the claimant to repress disorder and turbulence, and to maintain the proper and necessary discipline in the prison was a duty of another sort. It was created by the contract, and it was an absolute duty. The claimant was not entitled to aid in its discharge from the bankrupt, and it was not absolved from its discharge by the bankrupt's acts or omissions. If the idleness of the convicts rendered the maintenance of order more arduous, it was for the claimant to remedy the evil by an appeal to its own resources. If one guard was not enough for the restraint of a given number of men, then its duty was to add more guards, until the force was sufficient for the purposes of its organization.

Now it is very evident from the testimony that the discipline in the state prison (south) during a large part of the time covered by these contracts was not what the contract guaranteed. It was not "good," and the service rendered under it was not "diligent and faithful" when there was work to do. The truth is, it was very bad. This is shown by the positive testimony of many witnesses, and by the excuses which accompanied the reluctant admissions of others. It is shown by a preponderance of the proof, and it is also shown that the bankrupt was injured thereby.

It is a rule of law that one may recover for services rendered or materials furnished under a special agreement which has been partly performed, an amount not exceeding the contract price there of, when the services or materials have been accepted and applied to the use and benefit of the other party to the agreement. The practical difficulty in such a case is to fix the valuation of what has been done or supplied; to determine the proper rate and method of measurement. According to the weight of authority in this state the amount that ought to be recovered for the partial performance of a contract for a specific undertaking, is the amount that remains after deducting from the contract price for the whole undertaking the sum necessary to complete it. The amount of recovery is not, therefore, the actual value of the services or materials, but it is the remainder, after deducting from the price fixed by the contract for the entire services or materials the loss or damage sustained by the failure to fully render the one or furnish the other according to the terms of the contract, and this loss or damage is the amount necessary to procure other services or materials of the same character and quality. McKinney v. Springer, 3 Ind. 59; Epperly v. Bailey, Id. 72; Manville v. McCoy. Id. 148.

The loss or damage in this case results from the failure of the claimant to perform one of the stipulations of the contract as to

the maintenance of proper discipline, and it consists in a diminished productiveness. It is shown by the testimony that the productiveness of the convict labor was reduced in this way one-third during the greater part of the time included within the terms of the claim in controversy. No other damage being shown, this must be accepted as the sole measure of that sustained by the bankrupt, and the claimant cannot object to this mode of estimating its amount. The claimant thus receives the contract price for as much labor as was actually furnished, and, under the decisions of the supreme court of this state, this is the maximum that may be recovered upon the partial performance of a contract. I find, therefore, that the amount of recovery in this case ought to be a sum one-third less than the contract price for the period of time beginning August 1, 1873, and ending on June 15, 1875; or, in other words, two-thirds of the amount claimed therefor.

Third. As to the rank and priority of this claim. The Revised Statutes of the United States provide: "Sec. 5101. In the order for a dividend, the following claims shall be entitled to priority, and to be first paid in full in the following order: * * * Third. All debts due to the state in which the proceedings in bankruptcy are pending and all taxes and assessments made under the laws thereof."

This is clearly a "debt due to the state," but it is urged by the counsel for the assignee that it is not the intention of the bankrupt law to create priorities; that its intention is to recognize their existence only when they have been already created by the laws of a state or the United States. The bankrupt law does, however, create a priority in this state when it provides, in the same section: "Fourth. Wages due to any operative, clerk, or house-servant, to an amount not exceeding fifty dollars, for labor performed within six months next preceding the first publication of the notice of proceedings in bankruptcy," shall be entitled to priority of payment. According to the argument of the counsel, the provision is applicable only to a state like Pennsylvania, where the wages of operatives are entitled to preference by its own laws; and neither the third nor the fourth clause of section 5101, is applicable to a state like Indiana, where neither debts due the state, of the sort under present consideration, nor the wages of operatives, are preferred by its laws. This special and limited application of the bankrupt law would be destructive to its uniformity, and congress has no power under the constitution to provide any but a uniform system of bankruptcy. Congress has recognized and reaffirmed many existing priorities by this section, no doubt, but it has gone beyond this point, and, in language whose meaning is unmistakable, made them common and universal wherever the law operates. It would have been an act of supererogation for congress to have merely provided that priorities which already exist shall be protected in bankruptcy, for this has been repeatedly held to be the law independently of any express provision of the bankrupt law. It was so held as to the claims of the United States in the case cited by the counsel, and it is upon precisely the same principles of reasoning that priorities created by the laws of the states are protected. The assignee receives the estate of a bankrupt subject to all the liens and equities thereon. It is true that congress has declared that certain priorities created by the laws of the state are violations of the bankrupt law, and that as such they shall be set aside in bankruptcy, but this really proves the rule, for it is only when they are set aside by its express terms that this protection is refused. This rule of law is stated very fully in Re Brand [Case No. 1,809], quoted by the counsel. The court says:

"It is a well settled principle that the assignee of a bankrupt takes his estate subject to all the liens against the same, as well as all the equities existing against it. The assignee merely succeeds to the rights of the bankrupt, and is affected by all limitations imposed by law against the bankrupt's estate antecedent to his accepting the trust. Courts in bankruptcy invariably respect bona fide liens obtained against a bankrupt anterior to his adjudication as a bankrupt, if not within the prescribed period." It may be added that the quotation from this opinion of the court in the brief of the counsel refers exclusively to the laws of West Virginia, and not to the bankrupt law.

In my opinion the debt due the claimant is entitled to priority of payment under the provisions of section 5101, of the Revised Statutes of the United States.

There is no controversy as to the claimant's performance of these contracts for the period of time beginning June 15, 1875, and ending January 10, 1876. and I find that there is due thereon for this period the balance of seven thousand nine hundred and forty-four dollars and sixty-nine cents.

I find upon the whole that the claim and proof of debt of the state of Indiana, by Andrew J. Howard, etc., in the sum of twenty-eight thousand, seven hundred and forty-four dollars and sixty-three cents, ought to be reduced to the sum of seven thousand, nine hundred and forty-four dollars and sixty-nine cents, and that it ought to be allowed and paid in the sum last aforesaid as a preferred debt of the third class under the provisions of section 5101, Rev. St. U. S.

GRESHAM, District Judge. The register's report is in all things approved.