In re WORCESTER COUNTY. DERBY v. WORCESTER COUNTY. In re DERBY.

(Circuit Court of Appeals, First Circuit. April 20, 1900.)

Nos. 308, 312, 318.

1. APPEAL—TIME FOR TAKING—REHEARING.
    Where a circuit or district court permits the filing of a petition for rehearing during the term at which the order or decree sought to be reviewed was entered, it retains jurisdiction to act upon such petition at a succeeding term, and the time for appeal does not begin to run until such action is taken.

2. BANKRUPTCY—REVISION BY CIRCUIT COURT OF APPEALS—TIME FOR FILING PETITION.
    A petition for revision of the proceedings of a court of bankruptcy in matter of law, under Bankr. Act 1898, § 24b, may be filed in the circuit court of appeals at any time within six months from the ruling, order, or decree sought to be revised.

3. SAME—REVIEW OF ORDERS—PROCEDURE.
    A party who is in doubt as to his right of appeal from an order in bankruptcy may, in addition to taking an appeal, file a petition for revision, under section 24b of the bankruptcy act; and the circuit court of appeals may determine the matters complained of in either or both proceedings, as it shall determine to be appropriate.

4. SAME.
    Congress having specifically provided, in Bankr. Act 1898, § 25, for an appeal with reference to proofs of debts exceeding $500, on which appeal all questions are open to the appellate tribunal, and having also provided (section 24b) that, for all matters of administration which concern the relations to each other of the different interests in the estate, the action

of the bankruptcy court shall be revised only in matters of law, the courts are not at liberty to disregard the distinction so created; and, where an order allowing the proving of a claim also determines its priority, the former part of the order is appealable, but the latter part can only be reviewed on a petition for revision.

5. SAME—PARTY ENTITLED TO PROVE DEBT—ACTUAL OWNER.

A county owning an account against a bankrupt, for which a note was taken prior to the bankruptcy, payable to another, but for the use of the county, may prove the debt against the bankrupt in its own name, as the actual owner either by claiming and proving the note, or surrendering it and proving the account.

6. SAME—PRIORITY OF CLAIM—EFFECT OF TAKING NOTE.

Taking a note does not discharge an original debt having any privileges under the bankruptcy law, and either may be proved.

7. MUNICIPAL CORPORATIONS—CONTRACTS—VALIDITY.

The violation of statutory provisions in regard to the mode of making contracts by counties, designed for their protection, may be waived by a county, and cannot be urged by the other party to defeat the contract.

8. BANKRUPTCY—CLAIMS IN FAVOR OF COUNTY—RIGHT TO PRIORITY.

Under Bankr. Act 1898, § 64, providing for priority of payment of "debts owing to any persons who by the laws of the state or the United States are entitled to priority," and the provision of section 1 that "persons shall include corporations except when otherwise specified" a county in Massachusetts, which by the insolvency laws of the state (Pub. St. c. 157, § 104) is made a preferred creditor of an insolvent, is entitled to priority as to a claim due the county from a bankrupt.

9. SAME—EFFECT OF ACT ON STATE—INSOLVENCY LAWS.

The insolvency laws of a state were not annulled by the bankruptcy law, but continue operative, although within a limited range.

10. SAME—DEBTS DUE COUNTY—CLAIM FOR PRISON LABOR.

Under the General Statutes of Massachusetts, which provide that houses of correction shall be built, equipped, and maintained by the several counties, and by which the county makes direct and specific payment for every article of every nature used in connection with the industries carried on in the house of correction which are to be established by the county commissioners, and receives all proceeds of the labor and earnings of the prisoners, the master, who is a deputy sheriff, being required to deposit such proceeds as trustee, and pay the same at stated intervals into the county treasury, a claim for the labor of prisoners in such a house of correction is a debt due the county, within the meaning of Pub. St. c. 157, § 104, which gives such debts priority against the estates of insolvents, and such a claim may be proved by the county, as owner in bankruptcy, and is entitled to priority, under Bankr. Act 1898, § 64.

Appeal from the District Court of the United States for the District of Massachusetts.

Thatcher B. Dunn and James A. Stiles, for appellant.
George S. Taft, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge. The underlying questions involved in these three cases are the right of the county of Worcester to prove a claim in bankruptcy, and to have priority for the claim if allowed, all under the bankruptcy act of July 1, 1898, c. 541 (30 Stat. 544). The referee allowed the claim, but refused it priority. On appeal to the district court, that court, on the 21st day of July, 1899, entered an order as follows: "It is hereby ordered and decreed that the debt may

be proved by the county and is entitled to priority, and that the decree of the referee be modified accordingly." Derby, the trustee in bankruptcy, desired to appeal, but he failed to do so within the 10 days limited by the statute for appeals. Thereupon, on the 30th day of August, 1899, he filed a petition for rehearing. It is apparent that the purpose was to revive the right of appeal. The court treated the petition for the rehearing as a petition for a review, and on the 4th of October, 1899, granted it, and on the 10th entered an order as follows: "It is hereby ordered and decreed that the proof of the county of Worcester be allowed as a debt entitled to priority." It will be noticed that the order thus entered departed literally from that of the 21st day of July, but we assume that the second was intended to be substantially the same as the earlier one, and to have effect both to allow the proof and to establish its priority. Derby, as trustee, thereupon appealed, and his appeal is the subject-matter of "Derby, Trustee, v. County Worcester." The grounds of his appeal are two: First, that the district court erred in allowing the proof; and, second, that it erred in allowing it as a debt entitled to priority.

The order of July 21st was entered during the term of the district court which commenced on the fourth Tuesday of June, 1899, and the petition for rehearing was filed at the same term. The order granting the rehearing, however, was entered at the term commencing on the second Tuesday of September, 1899. Inasmuch as the petition was filed during the June term, and was not stricken out, but was heard and its merits acted on at the September term, it must be accepted that the petition was filed at the June term with the consent of the court, and that the court thus held its control over the proceeding. In Andrews v. Thum, 12 C. C. A. 77, 64 Fed. 149, decided by this court, the facts were as follows: A petition, which we held to be, in substance, a petition for a rehearing, was seasonably filed in an equity cause at the October term of the circuit court for the district of Massachusetts. There was nothing in the case to show that the petition was brought to the attention of that court until the succeeding May term, when it heard it on its merits and denied it. We held that the proceeding was effective, and that the time for appeal did not begin to run until the petition was denied. This decision was cited, without disapproval, in Kingman & Co. v. Western Mfg. Co., 170 U. S. 675, 679, 18 Sup. Ct. 786, 42 L. Ed. 1192. We relied on Smelting Co. v. Billings, 150 U. S. 31, 14 Sup. Ct. 4, 37 L. Ed. 986, an examination of which will show that it fully supports the proposition we now make. Thus, it appears thoroughly settled by authority that, under the circumstances, the district court retained its control over the proceedings, and granted a rehearing and entered a new decree, with the same effect as though the whole had occurred during the June term. During that term the court had, of course, entire control over the decree entered on July 21st, and might at any time vacate it and enter a new decree. It is of no consequence whether the petition was regarded by the district court as a petition for a rehearing or for a review, as the power of the court in this particular is regardless of forms, and may be exercised even in a summary manner. A striking illustration of this is found in Bank of Commerce v. Tennessee, 163 U. S. 416, 16 Sup. Ct. 1113, 41 L. Ed.

211, where the court, after a mandate issued, recalled it and modified its judgment.

The district court therefore had power during the term at which the decree was entered to vacate it and enter a new decree, and retained this power over the case by permitting the filing of the petition for a rehearing, as we have already shown, so that the result is in all respects the same as though all the proceedings had occurred at the June term. Nevertheless, under the jurisdiction vested in the several circuit courts of appeals to superintend, in matters of law, the proceedings of the several courts of bankruptcy within their jurisdiction, the county filed its petition to revise the action of the district court in reopening its decree and entering a later one. This is the subject-matter of the case entitled "County of Worcester, Petitioner," which, for the reasons given, need not be further considered.

We will add that, in view of what we have said, we have no occasion to consider whether or not the organization of the district court, sitting in bankruptcy, is, by the statute, of a continuous nature, so that, according to the expressions in Sandusky v. Bank, 23 Wall. 289, 292, 293, 23 L. Ed. 155, and in Stickney v. Wilt, 23 Wall. 150, 164, 23 L. Ed. 50, its proceedings are not subject to the ordinary rule that rehearings must be asked for at the term at which the judgment is entered, or to the other rule that bills of review for matters appearing on the face of the record must ordinarily be brought within the time limited by statute for taking appeals, as shown in Central Trust Co. v. Grant Locomotive Works, 135 U. S. 207, 227, 10 Sup. Ct. 736, 34 L. Ed. 97, and in Reed v. Stanley, 38 C. C. A. 331, 97 Fed. 521, decided by the circuit court of appeals for the Ninth circuit.

The subject-matter of the remaining case, "Derby, Trustee, Petitioner," is in all respects the same as the subject-matter of "Derby, Trustee, Appellant, v. County of Worcester." The statute of bankruptcy (section 24b, 30 Stat. 553) establishes the jurisdiction of this court to superintend and revise in the following language:

"The several circuit courts of appeal shall have jurisdiction in equity, either interlocutory or final, to superintend and revise, in matter of law, the proceedings of the several inferior courts of bankruptcy within their jurisdiction."

Section 25 of the same act (30 Stat. 553), providing for appeals, enacts that "appeals, as in equity cases, may be taken in bankruptcy proceedings from the courts of bankruptcy to the circuit court of appeals * * * from a judgment allowing or rejecting a debt or claim of five hundred dollars or over." In Re Good (C. C. A.) 99 Fed. 389, the circuit court of appeals for the Eighth circuit determined that what is matter of appeal under section 25 is not matter for revision under section 24. This is undoubtedly correct; yet it appears that Derby, being doubtful whether his remedy was under section 24 or section 25, undertook to avail himself of both until the question of procedure was determined. The county urges on us that the two proceedings neutralize each other, or that one of them, at least, operates to annul the other. We see no necessity for a conclusion of this nature. It has never been held by the supreme court in any of the several cases where parties have been doubtful whether their remedy was by error or appeal, and have therefore taken both, that one of them

nullified the other; but instances are reported where the court has heard both the writ of error and the appeal, acting on each by the dismissal of one, and giving a judgment on the merits of the other, according as the law requires. Improvement Co. v. Bradbury, 132 U. S. 509, 515, 10 Sup. Ct. 177, 33 L. Ed. 433. There is nothing in the fact that Derby instituted both of these proceedings which lays any equitable basis for this proposition of the county, because, in contemplation of law, no substantial injury was thereby done it.

In any view of the dates of proceedings, Derby's petition was seasonable. The original decree was entered, as we have already said, on July 21, 1899. The petition to review was filed in this court on December 7, 1899; that is, within six months. The statute fixes no time within which a petition of this nature must be filed, so that unless some time is fixed by rule, as was the case in Re Hien, 166 U. S. 432, 17 Sup. Ct. 624, 41 L. Ed. 1066, or by following some analogous provision of statute, petitions of this character can be filed with reference to any proceeding in bankruptcy so long as the decree is executory, or the case has not been closed. The bankruptcy act of 1867 in like manner omitted any limitation on the exercise of the revisory power of the circuit court, so that, in this circuit a rule was entered on September 15, 1870, requiring that the petition should be filed within 15 days after the ruling, order, or decree appealed from. Inasmuch as there is no statutory limitation fixing the time for filing bills for review for matters arising on the face of the record, Central Trust Co. v. Grant Locomotive Works, already referred to, determined that the time must be limited to that given by statute for taking an appeal from the decree sought to be reviewed. After a careful consideration of the question, the circuit court of appeals for the Ninth circuit, in Reed v. Stanley, ubi supra, held that, on the same rule, the time within which a bill of review might be filed, since the act establishing the circuit court of appeals was passed, is limited by analogy to the six months allowed by statute for taking appeals to the last-named court. By parity of reasoning, it would seem to follow that the time for filing a petition for revision under section 24 must be limited to six months. Certainly it can be no shorter, and we have already shown that the petition was filed within that period.

Whether or not we shall take jurisdiction of the matters now before us on a petition for revision or on appeal is a substantial question, because on a petition for revision we are limited to matters of law, while on appeal the whole record is open. The right of appeal is applied, so far as the amount is concerned, to debts of $500 or over; thus indicating a settled determination on the part of congress not to leave the final decision of a right to prove a considerable claim in the power of a single judge in any part. It becomes at once apparent that this substantial right of appeal ought not to be taken away merely because the party who proves a debt also claims a priority in connection therewith.

It becomes necessary in this connection to examine somewhat further the provisions of the statute of 1898 with reference to the method of proving claims, and also the general orders and forms in bankruptcy relating thereto. Nothing is found in the orders giving any special

direction with reference to the manner of proving claims in connection with which a priority is asserted. Neither do the prescribed forms for proofs of debts contain anything of that character, although the form of the proof of a secured debt requires that it shall enumerate the securities held by the creditor. Neither is there anything in the statute giving any direction as to the method of proving a debt in reference to a priority. The topic is covered by section 57 (30 Stat. 560). The first paragraph of that section ("a") gives detailed directions for the proof, but it omits any reference to the matter of priority, although it is express about proofs by creditors holding securities. Paragraph "e" provides that the claims of secured creditors and of those who have priorities may be allowed, in order to enable such creditors to participate at meetings held prior to the determination of the value of their securities or priorities, but they are thus to be allowed for such sums only as to the court seems to be owing over and above the value of their securities or priority. This, however, concerns only the preliminary determination in a preliminary way of the franchise rights of creditors.

Section 64 (30 Stat. 563), which fixes priorities, commences with a direction that the court shall order the trustee to pay taxes due various enumerated entities in advance of the payment of dividends. It proceeds, in the next paragraph, that the "debts to have priority, except as herein provided, and to be paid in full out of bankrupt estates, and the order of payment shall be: [Then comes the enumeration of the various classes of debts, 1 to 5, which we need not repeat.]" There is nothing in this section to indicate that the question of priority is essentially involved in the mere matter of proving a debt, or even that a claim to priority should appear in the formal proof. In the act of 1867, afterwards found in section 5101 of the Revised Statutes, which covered the entire matter of priority, the matter was put clearly as follows: "In the order for a dividend, the following claims shall be entitled to priority and are to be first paid in full in the following manner." Then is given a schedule of the different classes of priority claims. We can conveniently place our hands on only two cases showing the method of proceeding under that statute, which are In re Handell, 15 N. B. R. 71, Fed. Cas. No. 6,017, and in Ex parte Rockett, 15 N. B. R. 95, Fed. Cas. No. 11,977, in each of which the question of priority was treated purely as one of administration, and was not connected with the proofs of debts.

On the whole, congress having provided specifically in the act of 1898 for an appeal with reference to proofs of debts exceeding $500, on which appeals all questions are open to the appellate tribunal, and having also provided that, for all matters of administration which concern the relations to each other of the different interests in the estate, the action of the bankruptcy court shall be revised only in matters of law, it is plain that congress insisted on a distinction of a substantial nature, which we are not at liberty to disregard. Whether or not the county of Worcester has any debt provable belongs in the first class. Whether or not it has any debt as to which it is entitled to priority is a question of administration, which can ordinarily present no question of importance, except of law, arising from facts which can rarely be disputed. Therefore it belongs of right to the

second class. The fact that, for convenience, the learned judge of the district court combined both questions in one decree, can in no way affect the substantial distinctions which congress has made between the mere power to revise and a full appeal. We therefore must sever what the district court has apparently combined. Inasmuch as the trustee maintains that the county of Worcester has no debt which it can prove for any purpose against the bankrupt estate, we must dispose of that question on the appeal; and, inasmuch as he also claims that, even if the county has a provable debt, it is not entitled to any priority, we must dispose of that question on the petition for revision. The circuit court of appeals for the Seventh circuit had this topic under consideration in Re Rouse, Hazard & Co., 33 C. C. A. 356, 91 Fed. 96, although not before it in the precise form in which it comes before us. The only question there was that of priority, and the court held that this was not governed by the provisions of section 25 granting appeals. The opinion observed, however, at the foot of page 98, 91 Fed., and page 358, 33 C. C. A., that, if the controversy had been in respect to the merits of the claims, the court would have been without jurisdiction on a petition for revision. The line of reasoning would have led to the same result which we have reached, if the matter had come up in the same form.

This brings us to the merits of the controversy. The claim in issue is a balance due for labor of prisoners confined in the house of correction at Fitchburg, in the county of Worcester. A preliminary objection is made by the appellant that the claim proved was represented originally by an account, and that for a part of the claim a note was given, signed by the bankrupts, payable to the order of Benjamin D. Dwinell, the master of the house of correction. This note was dated October 1, 1898, which was after the approval of the bankruptcy act, and it bears the blank indorsement of Dwinell. This indorsement was made after the adjudication of bankruptcy. The proof is made up of this note and of so much of the account as the note does not cover. Accompanying the note was a mortgage, which, we understand from the record, the county offered to surrender, proving its claim as entirely unsecured. In bankruptcy, it is of no consequence whether proof was made of the original account or of the note. There is no evidence that the parties had any intention, except to take and give a note for an account in the usual way. Taking a note does not discharge an original debt which has any privileges, and either might be proved. Such is the law of the federal courts, which would govern us on this particular question, if it became important. The local decisions seem to be the same. The Kimball, 3 Wall. 37, 46, 18 L. Ed. 50. If the county was the owner of the original debt, and the note was taken on account of that debt by the master of the house of correction, the county would be entitled to demand the note as its property if it saw fit so to do. In that event, at the common law, the note, unless indorsed before suit by the payee, would necessarily be sued in the name of the payee, but the litigation would be controlled by the county. Bankruptcy, however, is governed by the rules of equity proceedings, and takes no cognizance of the technical rules of the common law with reference to parties to litigation, and, like

equity, it acts in the names of the parties substantially interested. So that, whether or not the note was indorsed by Dwinell, the debt could be proved by the county, if it owned it (as it was proved), and in no other way. The indorsement by Dwinell was of no effect, except as a matter of convenience, as affording uncontroverted evidence that it belonged to the county. Even claims assigned before bankruptcy must be proved by the assignee. This was so determined by Judge Lowell in Re Fortune, 1 Low. 384, Fed. Cas. No. 3,586,—a decision which was never controverted, and which, on fundamental principles of equity rules of proceeding, cannot be. In case of a debt assigned before bankruptcy, the original assignor is not entitled to be recognized, either in a petition for an adjudication of bankruptcy, or in a proof of debt; and the assignee necessarily comes in his own name as the only party to the record. All the discussion and doubt about the method of proceeding with assigned debts, whether under the present statute or previous ones, relate to those assigned after the proceedings in bankruptcy are commenced. Paragraph 3 of general orders in bankruptcy No. 21 (32 C. C. A. xxii., 89 Fed. ix.), by its very terms, implies that it is limited to assignments of this character. Therefore, if the original account belonged to the county, so, at its option, did the note, and the county, claiming the note, might prove it, or, repudiating it, it might prove the original account. In either case the law of priorities applies with the same effect, if it applies at all.

The appellant maintains that, by reason of certain facts which he has stated, the contract between the master of the house of correction and the bankrupts was violative of certain statutory directions as to method and form, and therefore in no event could it accrue to the county. This, however, is met by the well-known principle of law that, inasmuch as the statutory directions about the method of making such contracts are for the protection of the county, it could waive any noncompliance with them. The contrary view would impose a punishment in lieu of the protection which it is the purpose of the statutes to give. This particular case is clearly within the line of decisions with reference to transactions by national banks in violation of statutory regulations. Thompson v. Bank, 146 U. S. 240, 251, 13 Sup. Ct. 66, 36 L. Ed. 956.

Also, assuming that this claim was provable by the county, we agree entirely with the judge of the district court that it is entitled to priority. Claims of this character were given priority under the act of 1867. In re Mellor, 10 Ben. 58, Fed. Cas. No. 9,401; In re Southwestern Car Co., 9 Biss. 76, Fed. Cas. No. 13,192; In re Dodge, 4 Dill. 532, Fed. Cas. No. 3,949. Among the debts entitled to priority under section 64 of the bankruptcy act of 1898, to which we have referred, are "debts owing to any person who, by the laws of the state or the United States, is entitled to priority." The first section of the act provides that "persons shall include corporations, except hen otherwise specified." The county of Worcester is acknowledged to be a corporation, although in the class often called "quasi corporations." The provision of section 64 to which we have referred is claimed by the county to relate to that in the insolvency

laws of Massachusetts found in Pub. St. c. 157, § 104, which awards priority "to all debts due to the United States, and all debts due to and taxes assessed by this state, or any county, city or town therein." We are unable to conceive of any priority to which any one may be entitled by the laws of a state, under section 64 of the bankruptcy act, unless it be a priority created by insolvent laws of that character. It is true that priorities are often created by state statutes relating to the administration of estates of deceased persons, and also to proceedings for winding up corporations, but such laws are not of that general character which can be supposed to be within the purview of the provision of the bankruptcy act which is concerned here. Of course, statutes touching assignments for the benefit of creditors must be classed with insolvency laws, strictly so called. It is settled that state insolvency laws are not annulled by the enactment of a bankruptcy act, and that the only effect of such enactment is to suspend their operation, so that they become operative again, without re-enactment, when the bankruptcy act is repealed. Butler v. Goreley, 146 U. S. 303, 314, 13 Sup. Ct. 84, 36 L. Ed. 981. Moreover, the last paragraph of the bankruptcy act of 1898 (30 Stat. 566) enacts that "proceedings commenced under state insolvency laws before the passage of this act shall not be affected by it." Consequently the insolvency law of Massachusetts was not only not annulled, but it continued an operative law after the bankruptcy act was approved, though within a limited range. Moreover, it was the law of the state in force the instant the bankrupt statute was approved. However all this may be, section 64, as we have said, necessarily refers to the class of laws which we have cited from the Public Statutes, because on no practical, sensible theory could it refer to any other. We fully agree with the conclusions of the learned judge of the district court in this particular.

The troublesome question remains to be disposed of, whether the debt proved in this case was one due the county, within the meaning of the provisions of the insolvency laws of Massachusetts which we have cited. Whether or not the claim may be proved by the county, if it is the substantial owner of it, depends on the rules of administration of the bankruptcy act as determined by the federal courts. These we have substantially pointed out. But its ownership and consequent right of priority depend on the construction of the statutes of Massachusetts. Certain moneys due the warden of the state prison were held by the supreme judicial court of Massachusetts, in Com. v. Phœnix Bank, 11 Metc. (Mass.) 129, not entitled to priority as moneys due the state. Unless the cases can be properly distinguished, Com. v. Phœnix Bank must control.

The state statutes applicable, so far as they have been cited to us, are Rev. St. 1836, c. 144, which was the statute under consideration in Com. v. Phœnix Bank; Pub. St. 1882, c. 220, §§ 7 to 26, each inclusive; Acts 1887, c. 447; Acts 1888, c. 403; Acts 1890, c. 215; Acts 1891, c. 228; Acts 1898, c. 277. The first question arising is whether or not the house of correction for the county of Worcester has any special relations to the county. Is it simply an instrument of government, the cost of which, on account of its somewhat local relations,

the legislature may properly direct to be borne by the county? Or does it bear a more intimate relation to the county, like, say, a turnpike or bridge which the legislature might require to be constructed by the county, although for the uses of the entire public, but for which the county might be authorized to reimburse itself by receiving the tolls? That, like many institutions of its class, it is an instrument of the state sovereignty, connected with the state administration of justice, there can be no question. This is made especially clear by Lane v. Com., 161 Mass. 120, 36 N. E. 755, showing that, to a certain extent, persons convicted of crime may be punished in the state prison, jail, or house of correction, and by the act of 1890, c. 278, providing for the removal of prisoners from a state farm to any house of correction in the county where such prisoner was convicted. In this aspect the house of correction stands, in all particulars, under the same well-known rules as the county court house in Morse v. Norfolk Co., 170 Mass. 555, 556, 49 N. E. 925. This, it was stated, the county might be required to construct, although its control, and, indeed, the persons who should construct it, may be selected as the legislature might see fit. Nevertheless, an examination of the statutes to which we have referred will show that the house of correction acquired peculiar relations to the county, which have never been abrogated, and especially that the entire beneficial interest in contracts made by its master reverts to the county, and money received thereon directly aids to reduce the burden of taxation otherwise resting on its inhabitants.

According to the provisions of Pub. St. c. 220, § 23, the sheriff had the custody, rule, and charge of the house of correction in his county, and of all prisoners therein, except in the county of Suffolk; and he was directed to keep the same by himself, or by his deputy as master, for whom he was made responsible. It was also directed that the master should appoint subordinates, for whom he (the master) should be responsible. By section 26, the county commissioners in each county fixed the salaries for all officers, assistants, and employés of the house of correction. Section 7 directed that there should be provided by the county commissioners in each county, with two exceptions, "at the charge of said counties, a fit and convenient house or houses of correction," "with convenient yards, workshops, and other suitable accommodations adjoining or appurtenant thereto." Section 11, also, required that the county commissioners in the several counties should cause to be provided, "at the expense of said counties," "suitable materials and implements sufficient to keep at work all the prisoners committed to the house of correction." Section 13 provided that the commissioners might make contracts for work to be done in the house; section 14, that they might make contracts for letting out to hire persons confined therein; section 53, that they should procure all necessary supplies for the house, to be furnished and purchased under their direction, at the expense of the county; and section 54, also, provided that all charges and expenses of safe-keeping, maintaining, and employing convicts therein, and the safe-keeping of all other persons therein, should be paid from the county treasury. Section 55 enacted that the county commission-

ers might order sums of money to be advanced out of the treasuries of the counties to the master of the house of correction for the purpose of providing tools, materials, and other things required for the employment, restraint, and safe-keeping of the convicts. Section 56 provided that the master should pay to the treasurer of the county, at such times as the officers of the county might direct, the amounts of sales and other proceeds of the labor and earnings of the prisoners in his custody.

Other provisions of this character might be cited from the Public Statutes, but we have given enough to show beyond question that the title to the house of correction, and all its appurtenances, materials, tools, and supplies, of every character, and consequently to the product thereof, including whatever might result from the labor of the prisoners, was, under that system of legislation, vested in the county, as its absolute property. There was no provision in the Public Statutes that any of the property, real or personal, or any contract for the labor of the prisoners, should vest elsewhere than in the county, either nominally or substantially. There was none that the master of the house of correction or the sheriff might bring suit in his own name for the recovery of any matter connected with, or concerning, the house, although it is not impossible that as the sheriff, under that system, was in the custody of the supplies, materials, and tools, he might have had sufficient qualified property or possession to enable him to maintain an action of trover; or, under some circumstances, of trespass. Nevertheless, the right of action for all sums due, as well as the substantial property right to all such sums, clearly vested in the county.

We are unable to discover anything in the subsequent legislation which changes substantially the property rights of the county as they were under the Public Statutes. The first was that constituting the state office of general superintendent of prisons. His duties, as given by the act of 1887, c. 447, § 7, are to establish and maintain such industries as may, from time to time, be determined upon by him and the master. So far as we have been able to discover, with that exception, the relations of the county commissioners and the sheriff to the house of correction remain substantially unchanged. The act of 1887 provided, in section 11, that the master should make payment into the treasury of the county whenever he had in his possession as great a sum as $5,000, and at least as often as once in each month. This related to all moneys received under the provisions of the act, whether for hire of labor or for the manufactures sold. The act also provided, in section 4, that the bills for tools, implements, and materials purchased, with the salaries of the persons employed under the act in the house of correction, should be paid monthly from the county treasury on schedules prepared and approved by the master and the general superintendent. This direction that bills should be paid from the county treasury was never changed, while the direction to the master to make payment of his entire receipts into that treasury was re-enforced by the act of 1898, c. 277, which emphasized that all receipts be paid into the county treasury each month, and that the expense of maintaining industries in houses of correction be paid

by the county treasurers, as required by chapter 447 of the act of 1887 and the acts in amendment thereof. This did not change the prior law, but it was probably enacted in order to rebuke certain loose practices which had grown up. The system was also re-enforced by the act of 1891, c. 228, authorizing the purchase of machinery for houses of correction, under certain circumstances, with the direction that the bills should be paid as provided in the act of 1887; and the nature of the agency of the master of the house of correction was also emphasized by the act of 1890, c. 215, requiring him to make deposits, "as trustee," of the moneys held in the interim of the monthly payments to be made into the county treasury.

It will thus be seen that the county makes direct and specific payment for every article of every nature used in connection with the industries in the house of correction; and, of course, it is a recognized rule of law that whoever pays for anything is presumed to be the owner of it. Therefore, as we have already said, there is nothing in the legislation subsequent to the Public Statutes to change the equitable and legal title to the house of correction, or to anything contained in it; but all such legislation leaves both the equitable and legal title in the county, while emphasizing the fact that it vests there. It necessarily follows that the results of the property thus owned by the county, whether it is in contracts for labor, receipts for labor hired out, or contracts or receipts for merchandise sold, vest where the principal matters from which they flow also vest; that is, in the county. The provision found in the act of 1887, § 12, that certain suits may be brought in the name of the master, is in terms permissive, and probably, at the most, a mere matter of convenience. There is nothing to preclude suits in the name of the county, or to change the results of litigation when judgments are obtained against the master. In that case they would undoubtedly be payable, not from his personal assets, but from the county treasury; and, if not paid, the remedy would be precisely the same in favor of the holders of the judgments as it would be to the holders of accounts for supplies not contested,—that is, mandamus to the county treasurer to pay them. Everything flows through the county treasury. Not a dollar can be expended except from it, and a county is a corporation liable to suit at common law. In this respect the house of correction stands in an essentially different relation from that of the state prison, as pointed out in Com. v. Phœnix Bank. The state was itself not suable, and therefore there was a necessity that its warden should be made suable, and that he should have assets in his hands to meet whatever judgments might be obtained against him. Consequently, as said by Chief Justice Shaw, at pages 138 and 139 of Com. v. Phœnix Bank, the state prison and its officers were constituted a separate and distinct establishment, and the revenues received by the warden were entirely under his control, to be applied by him to the purposes of the institution. He was expressly made the treasurer of the prison, and he was expressly directed to receive and pay out all moneys granted by the legislature for the support thereof; and the commonwealth had only an equitable interest in the residue, when there was any.

In these particulars the distinctions between the two institutions are of a marked and substantial character. Com. v. Phœnix Bank was against substantial underlying equity, and also against the ordinary principles of judicial equity which control proceedings in insolvency and bankruptcy. It must be held to be purely exceptional, and no case can be fairly brought within its rulings which does not conform to it in all substantial particulars. Therefore we are free to apply to the case at bar the same broad rules of equity which we would apply elsewhere under the bankruptcy statutes of the United States.

In 308 (County of Worcester, Petitioner), the proceedings of the court below are affirmed, and the costs of this court are awarded to Derby, Trustee, and there will be a decree accordingly.

In 318 (Derby, Trustee, Petitioner), the proceedings of the court below decreeing priority are affirmed, and the costs of this court are awarded to the county of Worcester, and there will be a decree accordingly.

In 312 (Derby, Trustee, v. County of Worcester), the decree of the court below, allowing the proof of the county of Worcester, is affirmed, and the costs of appeal are awarded to the appellee.